17-2474-cv
Starke v. SquareTrade, Inc.

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2017

Argued: April 30, 2018     Decided: January 10, 2019

Docket No. 17-2474-cv

ADAM J. STARKE,
Individually and On Behalf of All Others Similarly Situated,

*Plaintiff-Appellee,*

— v. —

SQUARETRADE, INC.,

*Defendant-Appellant,*

B e f o r e:

LYNCH and DRONEY, *Circuit Judges,* and SESSIONS, *District Judge.*[*]

Appellant SquareTrade, Inc., appeals from the district court's denial of its motion to compel arbitration. SquareTrade argues that the governing terms of its

[*] Judge William K. Sessions, III, of the United States District Court for the District of Vermont, sitting by designation.

contract with Appellee Adam J. Starke includes an arbitration clause. The district court concluded that the arbitration provision did not become part of the contract because Starke did not have reasonable notice of and manifest his assent to it. The order of the district court is AFFIRMED.

SOLOMON N. KLEIN (Bradley J. Nash, Schlam Stone & Dolan LLP, New York, NY; Mark Schlachet, Law Offices of Mark Schlachet, Cleveland, OH, *on the brief*) *for Plaintiff-Appellee.*

DOUGLAS A. WINTHROP, Arnold & Porter Kaye Scholer LLP, San Francisco, CA (Michael D. Schissel, Arnold & Porter Kaye Scholer LLP, New York, NY; Elisabeth S. Theodore, Arnold & Porter Kaye Scholer LLP Washington, DC, *on the brief*) *for Defendant-Appellant.*

GERARD E. LYNCH, *Circuit Judge*:

Defendant-Appellant, SquareTrade, Inc., sells protection plans for consumer products. Plaintiff-Appellee Adam J. Starke purchased one such protection plan. Starke filed this putative class action, seeking to hold SquareTrade accountable for alleged violations of consumer protection laws. SquareTrade moved to compel arbitration, contending that its contract with Starke included an arbitration clause. Starke opposed the motion, arguing that the purported arbitration clause had not become part of the contract because he did not have reasonable notice of the clause and did not manifest assent to it. The

United States District Court for the Eastern District of New York (Nicholas G.

Garaufis, *J.*) denied SquareTrade's motion, and SquareTrade appealed. For the

reasons that follow, we AFFIRM.

## BACKGROUND[1]

SquareTrade sells and administers service contracts called protection

plans, which provide protections against defects and damage to a variety of

consumer products. Unlike warranties, which are provided by the product's

manufacturer and are often included in the purchase price, SquareTrade

protection plans cover products made by other companies, and are sold for

additional consideration separate from the product price. SquareTrade markets

and sells protection plans on its own website as well as through retailers

including Costco, Target, Staples, Office Depot, and Amazon.

As relevant here, Starke purchased the "SquareTrade 2-Year Electronics

Protection Plan ($50-75)" (the "Protection Plan") for $4.34 plus tax through

---

[1] Courts deciding motions to compel apply a standard similar to the one applicable to a motion for summary judgment. *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003). On a motion for summary judgment, the court considers all relevant, admissible evidence submitted by the parties and contained in the pleadings, depositions, answers to interrogatories, admissions and affidavits, and draws all reasonable inferences in favor of the non-moving party. *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016).

Amazon. Starke intended the Protection Plan to cover a CD player he had purchased from Staples for $61.83. Starke had previously purchased several SquareTrade protection plans through Amazon and one through Staples to cover other items.

The Amazon webpage on which Starke purchased the Protection Plan looked like this:



 

**NORMAL-USE FAILURE** | **Manufacturer's Warranty** | **square trade**

**What else does a SquareTrade plan include?**

 **100% Parts & Labor, No Deductible**
We've got you covered. You pay nothing.
**Free Shipping**
We give you a prepaid shipping label to send your item to us. After we fix it, we send it back to you, FREE.

 **Cancel or Transfer Anytime**
Customers receive a full refund if they cancel in the first 30 days. Refunds are prorated after that. Transferring your protection plan is free and can be done online or over the phone.

 **Electronic Delivery**
We'll email your protection plan to you within two hours of purchase. (Remember to check your SPAM filter if you don't receive it.)

 **How does a SquareTrade plan work?**

File a claim online 24/7 at squaretrade.com/claims.

 

We'll cover shipping to and from our repair center.

If we can't repair your item, we'll provide you a replacement with the same or better features.

**Things to know:**
SquareTrade Protection Plans are only valid for new products purchased at Amazon within the last 30 days.
Upon purchase, you will receive an email. This is your official confirmation of purchase.
Your plan begins on the date you purchased your item and is inclusive of the manufacturer's warranty period. If you have an issue and are covered by the manufacturer during that time, you'll be directed to the manufacturer first.
If you sell or gift your device, you can transfer your warranty at no cost.
- You may cancel your plan anytime within the first 30 days for a full refund (refunds prorated after that).
- If your item arrives late, call SquareTrade and your plan can be extended to the shipping date.
- If you are eligible for and purchase this service plan, you acknowledge that Amazon may send the service plan seller relevant product and price information for the purpose of administering the plan.
- Your protection plan is only valid for one underlying product.

**Still have questions?**
Just visit **squaretrade.com** or call **1-877-WARRANTY**.

**Product information**

| Shipping Information | View shipping rates and policies |
|---|---|
| ASIN | B002KIBE8M |
| Item model number | RD-CE0074N2B |
| Customer Reviews | ★★★★☆ ▾  21 customer reviews<br>3.8 out of 5 stars |
| Date first available at Amazon.com | August 5, 2009 |

**Technical Specification**

Warranty [pdf ]

**Feedback**

If you are a seller for this product, would you like to **suggest updates through seller support?**
Would you like to **tell us about a lower price?**


amazon
AMAZON ORIGINAL
HAND OF GOD
Included with Prime Video
Start your free trial
Ad feedback

**Customer Questions & Answers**

Q Have a question? Search for answers

▲ 0 votes ▼ | **Question:** | Planning to buy a tablet for $49.99, so should I buy a plan that's Below $50 or one that's $50-$75?
| | **Answer:** | I would choose the larger option, just to amke sure that your tablet is fully covered. It is really up to you.
By H. Stevens on January 25, 2015
⤲ See more answers (2)

▲ 0 votes ▼ | **Question:** | Is this for modem?
| | **Answer:** | you can hve it for modem as you purchased brand new
By Girivasan Vadivelu on September 1, 2015
⤲ See more answers (2)

▲ | **Question:** | Will this work with any electronic, buying the sharkk 2o speaker

6

App'x at 113–14.[2]

The portion of the purchase page copied above contains several sections of information about the Protection Plan. A block of text towards the top of the purchase page informed Starke that his "Service Contract [would] be delivered via email and not mailed to [him]. It [would] come from SquareTrade Warranty Services . . . within 24 hours of purchase." App'x at 113. Much further down in the excerpted portion of the purchase page (which would likely require scrolling on most computer screens), one encounters the heading: "Product information." Under that heading appears a small hyperlink labeled "Warranty [pdf]." The "Warranty" hyperlink provided access to a two-page document titled "Terms & Conditions" stating: "Congratulations on purchasing this Protection Plan. Please read these terms and conditions carefully so that you fully understand your coverage under this Protection Plan." App'x at 40. The document contains terms purporting to govern the transaction, in addition to those terms appearing on the face of the Amazon purchase page. Notably, this document (the "Pre-Sale T&C")

---

[2] That is what the top half of the purchase page looked like. One who continued to scroll down the purchase page would come across additional customer questions and answers, customer reviews, additional advertisements and banners, and the Amazon.com footer. *See* App'x at 115–16.

did not contain an arbitration provision or a class action waiver.[3] Starke did not

click on the "Warranty" hyperlink and therefore, did not review the Pre-Sale

T&C. The Amazon purchase page did not contain a hyperlink to anything titled

"Service Contract."

Slightly above the "Product information" was another heading,"Things to

know." The first bullet point under this heading warns customers that

"SquareTrade Protection Plans are only valid for new products *purchased at*

*Amazon* within the last 30 days." App'x at 114 (emphasis added). The fifth bullet

point under this heading informs customers that they "may cancel [their] plan

anytime within the first 30 days for a full refund." *Id*. Starke did not read that

part of the purchase page and was not aware that the Protection Plan would not

cover items that had not been purchased through Amazon.

After his purchase, Starke received a confirmation email from Amazon

which informed him that "[his] protection plan service agreement [would] be

---

[3] SquareTrade represented to the district court that the Pre-Sale T&C document was "an outdated version of SquareTrade's Terms and Conditions." App'x at 75. Upon realizing that the outdated version was posted on Amazon, as a result of this lawsuit, SquareTrade contacted Amazon and requested that the updated version—apparently containing an arbitration provision—be posted in its place. On appeal, SquareTrade characterizes the Pre-Sale T&C as only a "sample" of SquareTrade's terms and conditions. Appellant's Br. at 5 n.1.

sent via a separate e-mail by [the] seller." App'x at 81. As the Amazon purchase page and confirmation email promised, Starke received an email from SquareTrade later that day. The email looked like this:



App'x at 83–84.

The subject line of the email says "SquareTrade Protection Plan on Amazon.com - Contract is Enclosed." The email contains several prompts and text in various formats. As relevant to this case, the email contains a hyperlink in the bottom left corner, labeled "Terms & Conditions," that links to an eleven-page document titled "Protection Plan Terms & Conditions." That document (the "Post-Sale T&C") is a different document from the Pre-Sale T&C, and contains several provisions that were absent from the Pre-Sale T&C. One of the provisions appearing in the Post-Sale T&C but not the Pre-Sale T&C purports to bind the parties to arbitration of "[a]ny controversy or claim arising out of or relating to this Protection Plan, or breach thereof . . . in accordance with the Commercial Arbitration Rules of the American Arbitration Association." App'x at 70. The Post-Sale T&C also contained a class action waiver and a California choice-of-law clause. Starke did not click on the "Terms & Conditions" hyperlink and did not review the Post-Sale T&C. Nothing in the body of the email referred to arbitration, and the email did not contain or refer to any attachments.[4]

_____

[4] According to Starke, following his prior purchases of SquareTrade protection plans on Amazon he had received, at most, confirmation emails that, at the very bottom, had links to Terms & Conditions, but that he never reviewed those documents. Starke's explanation of the emails he received from SquareTrade on these prior occasions is consistent with an affidavit submitted on behalf of SquareTrade indicating that SquareTrade's purchase confirmation emails have

After receiving the email, Starke followed the instructions directing him to send SquareTrade a copy of the receipt for his electronics item. Starke alleges that the receipt clearly stated that his CD player was purchased at Staples. Two days later, SquareTrade confirmed that it had received a copy of his receipt.

Some months later, Starke's CD player required repair or replacement, and Starke made a claim for coverage under the Protection Plan. SquareTrade denied the claim, notifying Starke that since the CD player had not been purchased through Amazon, it was not covered, and that his Protection Plan would be cancelled. SquareTrade offered Starke a refund for the full price of the Protection Plan.

Shortly thereafter, Starke filed this putative class action against SquareTrade, alleging fraudulent and deceptive practices by SquareTrade in the selling and marketing of protection plans. The complaint seeks damages and injunctive relief for violations of Sections 349 and 350 of New York's General Business Law, and the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*,

---

been delivered with substantially the same form and content since 2014. The one time Starke purchased a SquareTrade protection plan through Staples, he received a confirmation email from SquareTrade with the terms and conditions governing the transaction in the body of the email. Those terms and conditions contained neither an arbitration provision nor a class action waiver.

and for unjust enrichment. Starke alleges that SquareTrade knowingly and deceptively sells protection plans for items not purchased on Amazon and therefore, not eligible for coverage, despite knowing that under the terms of the plan, which are not prominently disclosed, the products which its customers have sought to protect are not eligible for coverage. According to the complaint, SquareTrade's limiting of covered products to those purchased through Amazon operates as an intentionally deceptive scheme to take money from unsuspecting customers. If a SquareTrade customer never makes a claim under her plan, SquareTrade keeps her premium and retains the policy until expiration. But if the customer makes a claim that requires SquareTrade to honor the policy, SquareTrade informs the customer that her protection plan is void because the underlying product was not purchased through Amazon.

Starke also alleges that SquareTrade fails to disclose other material terms and restrictions prior to the sale, and hoodwinks customers by providing them with pre-sale terms and conditions that differ from the more restrictive post-sale terms and conditions that are disclosed only after the purchase has been completed and only via a deliberately obscure hyperlink.

In response, SquareTrade moved to stay the action and compel Starke to

12

arbitrate his claims individually, citing the arbitration clause and class action waiver contained in the Post-Sale T&C. SquareTrade argued that Starke had reasonable notice of the Post-Sale T&C because the Amazon purchase page notified him that he would receive his "Service Contract" via email, the email he received from SquareTrade contained a hyperlink to the Post-Sale T&C, and Starke manifested assent to the Post-Sale T&C by failing to return the Protection Plan within the 30-day window SquareTrade allowed. SquareTrade also argued that Starke's prior course of dealing with SquareTrade put him on notice of the Post-Sale T&C.

The district court denied SquareTrade's motion. The court applied New York contract law to determine whether the parties had bound themselves to an enforceable arbitration agreement. First, the district court found that Starke did not have actual knowledge of the arbitration provision in the Post-Sale T&C because he did not click on the "Terms & Conditions" hyperlink in the SquareTrade confirmation email and read the hyperlinked document. Then the court considered whether Starke (1) had reasonable notice of the Post-Sale T&C and (2) offered an objective manifestation of assent to the Post-Sale T&C.

In determining whether Starke had reasonable notice of the Post-Sale T&C

13

and manifested assent to such terms and conditions, the district court applied the test adopted in *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 402–03 (E.D.N.Y. 2015).[5] Under that test, according to the district court, the court assesses four factors: (1) whether Starke was aware that he was binding himself to more than an offer of goods or services in exchange for money; (2) whether the design and content of the SquareTrade confirmation email made the Post-Sale T&C readily and obviously available; (3) whether SquareTrade required any affirmative manifestation of agreement to the Post-Sale T&C; and (4) whether SquareTrade clearly drew the consumer's attention to the Post-Sale T&C in general or the arbitration provision in particular.

As to the first factor, the district court concluded that Starke had reasonable notice that some contractual terms would be forthcoming because he set out to purchase a service *contract*. But, the district court noted, Starke's knowledge of the existence of some contractual terms did not necessarily mean that he could reasonably be expected to discern and agree to all of the contractual terms to which SquareTrade intended to bind him.

---

[5] The *Berkson* court applied the substantive contract law of New York, California, and Illinois, and determined that "these states['] laws are substantively similar with respect to . . . contract formation." *Berkson*, 97 F. Supp. 3d at 388.

The second, third, and fourth factors, according to the district court, counseled against finding reasonable notice and manifestation of assent. The district court found that the design and content of the SquareTrade confirmation email did not make the Post-Sale T&C readily and obviously available, because it did not draw any attention to the inconspicuously placed Terms & Conditions hyperlink in small font at the very bottom of the email. Rather, a reasonable person in Starke's position would have thought that the body of the email constituted the contract itself. Given that the terms of the contract were obscured and minimized, the district court held that Starke could not have evidenced a clear manifestation of assent. Lastly, the district court noted that SquareTrade did not draw Starke's attention to the arbitration provision buried in the Post-Sale T&C. The district court, therefore, held that SquareTrade failed to establish an enforceable arbitration agreement with Starke, and denied its motion to compel arbitration.[6]

SquareTrade timely appealed the district court's order pursuant to 9 U.S.C. § 16(a)(1)(C), which permits an interlocutory appeal from the denial of a motion

---

[6] Because the district court concluded that there was no enforceable agreement to arbitrate, it declined to assess the scope of the arbitration provision or the validity of the class action waiver.

15

to compel arbitration. On December 15, 2017, the district court stayed the

underlying action pending the outcome of this appeal.

## DISCUSSION

**I. Standard of Review**

We review the district court's denial of a motion to compel arbitration *de*

*novo* where the denial is based on a legal conclusion about whether the parties

contractually bound themselves to arbitrate. *See Meyer v. Uber Techs., Inc.*, 868

F.3d 66, 72–73 (2d Cir. 2017). Since the district court's conclusions regarding

notice and assent were based on undisputed facts, those conclusions are also

subject to *de novo* review. *Id.* at 73 (holding *de novo* review appropriate where the

evidence "consists exclusively of screenshots from the Web site and order

confirmation email, and the authenticity of these screenshots is not subject to

factual dispute").

"Where the undisputed facts in the record require the matter of

arbitrability to be decided against one side or the other as a matter of law, we

may rule on the basis of that legal issue and avoid the need for further court

proceedings." *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund,*

*Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011) (internal quotation marks omitted).

## II. Governing Legal Principles

The Federal Arbitration Act ("FAA") provides that written agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). This policy is founded upon "a desire to preserve parties' ability to agree to arbitrate, rather than litigate, [their] disputes." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012).

But despite the strong federal policy favoring arbitration, arbitration remains a creature of contract. *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (reiterating that it is a "fundamental principle" of the FAA that "arbitration is a matter of contract") (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). Thus, courts must still decide whether the parties to a contract have agreed to arbitrate disputes. *Schnabel*, 697 F.3d at 118 ("The threshold question facing any court considering a motion to compel arbitration is . . . whether the

parties have indeed agreed to arbitrate."); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 26 (2d Cir. 2002) (observing that it is "well-settled that a court may not compel arbitration until it has resolved the question of the very existence of the contract embodying the arbitration clause") (internal quotation marks omitted). That question is governed by state-law principles of contract formation. Here, the parties agree that New York contract law applies.

It is a basic tenet of contract law that, in order to be binding, a contract requires a "meeting of the minds" and "a manifestation of mutual assent." *See Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 93 N.Y.2d 584, 589 (N.Y. 1999). The manifestation of mutual assent must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms. *See Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (N.Y. 1981); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) ("Mutual assent is essential to the formation of a contract and a party cannot be held to have contracted if there was no assent or acceptance."). These requirements assure that the judiciary can enforce the parties' mutually-agreed terms and conditions when one party seeks to uphold them against the other. *Express Indus.*, 93 N.Y.2d at 589. Generally, courts look to the basic elements of the offer and the acceptance to

determine whether there was an objective meeting of the minds sufficient to give rise to a binding and enforceable contract. *Id.*

Where an offeree does not have *actual* notice of certain contract terms, he is nevertheless bound by such terms if he is on *inquiry* notice of them and assents to them through conduct that a reasonable person would understand to constitute assent. *See Schnabel*, 697 F.3d at 120. In determining whether an offeree is on inquiry notice of contract terms, New York courts look to whether the term was obvious and whether it was called to the offeree's attention. *See* 22 N.Y. Jur. 2d Contracts § 29 ("[A] party should not be bound by clauses printed on the reverse side of a contract unless it is established that they were *properly called to his or her attention* and that he or she assented to them.") (emphasis added). This often turns on whether the contract terms were presented to the offeree in a clear and conspicuous way. *See, e.g., Gildor v. USPS*, 179 F. App'x 756, 759–60 (2d Cir. 2006) (refusing to enforce contract provision incorporated on reverse side of postage label where the provision was "very small and difficult to read"); *Arthur Philip Export Corp. v. Leathertone, Inc.*, 87 N.Y.S.2d 665, 667 (1st Dep't 1949) (refusing to enforce contract terms that were inconspicuously placed in "small type and in parenthesis" on the back of a confirmation order).

19

We apply these same contract law principles to online transactions. *See Register.com,* 356 F.3d at 404 ("While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract."); *Specht*, 306 F.3d at 31 ("These principles apply equally to the emergent world of online product delivery, pop-up screens, hyperlinked pages, clickwrap licensing, scrollable documents, and urgent admonitions to "Download Now!"); *Resorb Networks, Inc. v. YouNow.com*, 30 N.Y.S.3d 506, 511 (N.Y. Sup. Ct. 2016) (noting that when evaluating a transaction occurring online, courts focus on "whether a reasonably prudent offeree would be on notice of the term at issue" and whether the terms of the agreement were "reasonably communicated to the user," because assent is mostly passive online).

In the context of web-based contracts, we look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in way that would put her on inquiry notice of such terms. *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) ("Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the [] agreement."); *Specht*, 306 F.3d at 23 (refusing to enforce

terms of use that "would have become visible to plaintiffs only if they had

scrolled to the next screen").

In *Nicosia*, 834 F.3d at 233–38, we examined an Amazon order page to

determine if it put a consumer on constructive notice of Amazon's "Conditions of

Use," which contained an arbitration clause.[7] The Amazon order page looked like

this:

_____

[7] In *Nicosia*, we applied Washington law on the question of contract formation, *id*.
at 231, but Washington law is the same as New York law with respect to the issue
of contract formation, *see id*. at 232.

21



*Id.* at 241 (Addendum B).

Amazon claimed that an arbitration provision contained in the "conditions of use" hyperlink (at the top of the page under the "Review your order" heading) was part of the contract it formed with the customer who placed an order on this

page. Several features of the order page's design and content were relevant to our analysis of whether the customer had inquiry notice of the terms at this hyperlink:

- The message "By placing your order, you agree to Amazon.com's . . . conditions of use" was not bold, capitalized, or conspicuous in light of the whole webpage. *Id*. at 237.

- Numerous other links on the webpage, in several different colors, fonts, and locations, generally obscured the message. *Id*.

- Multiple buttons and promotional advertisements on the order page drew attention away from the message. *Id*.

- The presence of customers' personal address, credit card information, shipping options, and purchase summary were distracting. *Id*.

Given these features of the order page, we held that reasonable minds could disagree regarding whether the customer was on inquiry notice of an arbitration provision contained in Amazon's Conditions of Use. *Id*. at 237. We therefore left it up to the factfinder to determine whether, when the customer clicked the "Place your order" button, she had manifested assent to the arbitration provision contained at the "conditions of use" hyperlink. *Id*. at 236–37.

23

More recently, in *Meyer*, we had to determine whether a user signing up for an Uber account was on inquiry notice of an arbitration provision contained in Uber's "Terms of Service," which were provided to the user via Uber's smartphone interface. 868 F.3d 66.[8] The "Terms of Service" were hyperlinked to the sign-up screen in an interface that looked like this:



---

[8] The *Meyer* Court applied California law to the contract formation question, but noted that "New York and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term." *Id.* at 74 (internal quotations omitted).

*Id*. at 82 (Addendum B).

We concluded that this interface did provide reasonable notice of the contract terms contained in the "TERMS OF SERVICE & PRIVACY POLICY" hyperlink because the hyperlink was clear and conspicuous. *Id*. at 77–78. In so concluding, we noted the following things about the design of the screen and the language used:

- The payment screen was uncluttered with only fields for the user to enter his or her credit card details, buttons to register for a user account or to connect to the user's pre-existing PayPal account or Google Wallet to the Uber account, and the warning that "By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY." *Id.* at 78.

- The text, including the hyperlinks to the Terms and Conditions and Privacy Policy, appeared directly below, i.e., was "spatially coupled" with the registration button. *Id.*

- The entire screen was visible at once, and thus the user did not need to scroll beyond what was immediately visible to find notice of the Terms of Service. *Id.*

- The register button was "temporally coupled" with the hyperlink – i.e., the consumer was notified of the terms at the time of sale. *Id.*

- The language "[b]y creating an Uber account, you agree" was a clear prompt directing the users to read

25

the Terms and Conditions and signaling that their acceptance of the benefit of registration would be subject to contractual terms. *Id*. at 79.

These factors led us to conclude that the user had been provided with objectively reasonable notice of the terms contained at the "TERMS OF SERVICE" hyperlink. And, since a reasonable user would know that by clicking the registration button he was agreeing to the terms and conditions accessible via the hyperlink, regardless of whether he actually clicked the hyperlink, we compelled arbitration. *Id*. at 79–80.

The reasoning of *Nicosia* and *Meyer* provides the framework within which we analyze the validity of assent to terms and conditions presented through a web interface.

## III. Reasonable Notice of the Arbitration Provision

To determine whether Starke had reasonable notice of the arbitration provision, we must analyze whether the Post-Sale T&C were provided to Starke in a clear and conspicuous way.[9] *See Meyer*, 868 F.3d at 75. Several things about the transaction and the email Starke received from SquareTrade following the

---

[9] The district court found that Starke "did not have actual notice" of the arbitration provision, and SquareTrade does not dispute that finding.

26

Amazon confirmation email lead us to conclude that Starke did not have reasonable notice of the arbitration provision, which was contained only in the Post-Sale T&C.

First, SquareTrade never directed Starke's attention to the "Terms & Conditions" hyperlink that contained the Post-Sale T&C. The first screen Starke encountered during the course of the transaction, the Amazon purchase page, did not provide Starke with notice that terms governing the sale would be provided via hyperlink. Instead, the Amazon purchase page notified Starke that he would receive something called a "Service Contract" via email. Then, Starke received an email from Amazon, notifying him that he would receive a "service agreement" from SquareTrade. Starke subsequently received an email from SquareTrade indicating that his "Contract" was enclosed. None of these various communications put Starke on notice that his "Service Contract" would come in the form of a hyperlink, rather than in the body of the email.

Second, when Starke opened the email from SquareTrade he was presented with a chart titled "Your Protection Plan." The chart described the particular Protection Plan that Starke purchased, and identified the "Coverage Amount," "Protection Plan Price," "Coverage Type," "Covered Product,"

"Deductible," "Quantity," "Coverage Term," "Coverage Start Date," "Coverage End Date," and "Waiting Period." This information took up approximately half of the email.[10] Nothing else in the email stands out as obviously being related to Starke's Protection Plan, and none of the language in the cluttered email directed Starke's attention to the hyperlink containing the Post-Sale T&C.

Third, the SquareTrade email bears more resemblance to the Amazon order page in *Nicosia*, 834 F.3d at 237, than to the uncluttered screen in *Meyer*, 868 F.3d at 78. The "Terms & Conditions" hyperlink is some of the smallest text in the

---

[10] SquareTrade argues that Starke could not have believed that the "Your Protection Plan" chart was his "Contract" because the chart itself referenced more detailed terms and conditions. Specifically, SquareTrade notes that the "Coverage Amount" is defined in the chart as "[u]p to the maximum coverage price of the Protection Plan, or the purchase price of your item, whichever is lower," and the "Coverage Type" is listed as "Standard." Without more, SquareTrade says, those terms would be meaningless.

But the language in the chart does not obviously point to additional details in another document. In fact, the terms that SquareTrade references are not even elucidated in the actual contract at the hyperlink. "Coverage Type" is defined in the Terms & Conditions only as "the level of coverage You purchased, such as whether Your Protection Plan includes Optional Coverage, such as Accidental Damage from Handling (ADH) coverage," App'x at 103, but nowhere does it describe the contents of "Standard" coverage, App'x at 83. Nor is there mention of the "coverage price of this Protection Plan" in the contract, such that Starke could compare it to the "purchase price of [his] item." App'x at 103. And, even if Starke thought that those terms could be defined in greater detail elsewhere, there was no reason for him to believe that such detail was available in the SquareTrade email, let alone the "Terms & Conditions" hyperlink.

28

email and comes after several prompts unrelated to the enclosure of the contract, including a "Need help?" hyperlink, a button for Starke to log in to his SquareTrade account, a hyperlink for Starke to submit the receipt for his CD player, the chart with details of the plan, and a banner urging Starke to review the Protection Plan on Amazon. Like the interface in *Nicosia*, and in sharp contrast with the screen in *Meyer*, the interface here is cluttered with diverse text, displayed in multiple colors, sizes and fonts, and features various buttons and promotional advertisements that distract the reader from the relevant hyperlink. *See Specht*, 306 F.3d at 31–32 (finding no inquiry notice of contract terms that were provided via hyperlink at the very bottom of the Netscape webpage which distracted viewer with praise for the product and a "Download" button).

Moreover, unlike in *Meyer*, the SquareTrade email in no way signals to Starke that he should click on the link, and it does not advise him that he would be deemed to agree to the contract terms in the document to be found by clicking that link. Nor does the email instruct him that the hyperlink is where his promised service contract can be found. The "Terms & Conditions" hyperlink appears without any "language advising [Starke] to click on [it]," *Starkey*, 796 F.3d at 197, or a "clear prompt directing [Starke] to read the Terms and

Conditions," *Meyer*, 868 F.3d at 79. The hyperlink was buried at the bottom of the email directly above the email footer. Far above the hyperlink, the second sentence of the email told Starke "You're all set!" encouraging him to look no further. The placement of the "Terms & Conditions" hyperlink in the email makes it hard to escape the inference that SquareTrade hoped the reader's eye would be drawn elsewhere.

This case is also distinguishable from *Meyer* because here, the "Terms & Conditions" hyperlink was neither spatially nor temporally coupled with the transaction. The "Terms & Conditions" hyperlink was spatially decoupled from the transaction because it was not provided near the portion of the Amazon purchase page actually requiring Starke's attention (that is, the "Add to Cart" button), or indeed anywhere on the purchase page. To provide conspicuous notice of the Post-Sale T&C, SquareTrade could have simply included a noticeable hyperlink on the Amazon purchase page directing consumers to review the terms and conditions. *See, e.g., Nicosia*, 834 F.3d at 237–38 (noting that "Amazon chose not to employ a clickwrap mechanism," which is "certainly the easiest method of ensuring that terms are agreed to"); *Starkey*, 796 F.3d at 197 n.3 (noting that it would have been "simpler to resolve" this question had a

clickwrap mechanism been used). And, even if SquareTrade was committed to providing the Post-Sale T&C via email, it could have done so in several more conspicuous ways, including by providing the Post-Sale T&C in the body of the email, providing an attachment to the email with the Post-Sale T&C, or by providing the "Terms & Conditions" hyperlink at the top of the email in a bigger font notifying the customer that the hyperlink is where he will find his "Service Contract," and that by rejecting the Protection Plan within the specific period, he would be deemed to have accepted those terms.[11]

---

[11] SquareTrade's argument that internet users know how hyperlinks work misses the point. The issue here is not that the Post-Sale T&C were provided via hyperlink. The problem is that the hyperlink was obscured and SquareTrade did nothing to alert Starke to the fact that this hyperlink contained his "Service Contract." *See Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009) (finding contract term contained in hyperlink unenforceable where hyperlink was not prominently displayed on the website and there was nothing prompting the user to click on hyperlink); *In re Zappos.com, Inc.*, 893 F. Supp. 2d 1058, 1064 (D. Nev. 2012) (finding plaintiff did not manifest assent to contract terms contained in hyperlink where the hyperlink was "inconspicuous, buried in the middle to bottom of every . . . webpage among many other links, and the website never direct[ed] a user to the Terms of Use"); *cf. Meyer*, 868 F.3d at 79 ("*As long as the hyperlinked text was itself reasonably conspicuous*—and we conclude that it was—a reasonably prudent smartphone user would have constructive notice of the terms.") (emphasis added); *Starkey v. G Adventures, Inc.*, 796 F.3d 193, 197 (2d Cir. 2015) (finding terms enforceable where the email containing the "TERMS AND CONDITIONS" hyperlink *directed the plaintiff to read the hyperlinked document*).

The Post-Sale T&C were also temporally decoupled from the transaction.

Starke purchased the Protection Plan from the Amazon website, but he had no

way to review the Post-Sale T&C until he received the SquareTrade confirmation

email. In *Meyer*, 868 F.3d at 78–80, we placed significant weight on the fact that

the "Terms of Service" hyperlink was temporally coupled with the register

button. For one, that meant that the user could not avoid noticing the hyperlink

when she registered for an account. But importantly, that also allowed the

plaintiff "to review the Terms of Service *prior* to registration, unlike web

platforms that provide notice of contract terms only *after* the user manifested his

or her assent." *Id.* at 80. (emphasis added).

In defense of its pay-now-terms-later approach, SquareTrade notes that

New York Insurance Law, which creates the legal framework within which

service contracts may be sold in the state, permits sellers to provide customers

with the contract governing their transactions within a reasonable amount of

time *after* the purchase. *See* N.Y. Ins. Law § 7903(b)(1). The law requires that

consumers be provided at least twenty days after the service contract has been

mailed to return the contract to the seller for a full refund. *Id*. at § 7903(e).

SquareTrade points out that it provided Starke with thirty days within which to

return his contract. However, Section 7903 is a regulatory regime that imposes certain disclosure responsibilities and other duties on sellers of service contracts, but it does not appear to alter New York law as to the manifestation of assent in contract formation. Nor has SquareTrade provided authority to support the proposition that it does.

Under general principles of contract law, moreover, providing contract terms after a transaction has taken place may be an appropriate way to contract in certain situations. But we find little justification for it here, where it would have been virtually costless for SquareTrade to provide the governing terms and conditions to Starke before he bought the Protection Plan. *See Schnabel*, 697 F.3d at 126–28 (noting that there was no policy rationale for a "terms later by email" conception of contract formation under the circumstances). Indeed, SquareTrade did provide a hyperlink to the Pre-Sale T&C, which do *not* contain the terms that SquareTrade seeks to enforce, on the Amazon purchase page.[12] But, had Starke

---

[12] We do not mean to suggest that the "Warranty" hyperlink provided sufficient notice of the Pre-Sale T&C, since that hyperlink was itself buried on the busy Amazon purchase page amidst various other hyperlinks, banner advertisements, and customer reviews, among other things. The point is merely that a consumer who clicked on that link would have been misled about the terms governing the transaction.

clicked on the "Warranty" hyperlink on the Amazon purchase page, he would have been taken to a document containing the Pre-Sale T&C, which set forth what would have appeared to be a complete recitation of the terms of the contract between the purchaser and SquareTrade. A consumer reviewing the Pre-Sale T&C would have reasonably believed that his contract did not contain an arbitration provision.

Of course, Starke, like any other offeree, had a duty to read the terms of the contract presented to him, including contract terms provided post-sale. But cases applying the duty-to-read principle still require that the offeree be put on notice of the existence of additional contract terms before it can be said that he has assented to them. *See Schnabel*, 697 F.3d at 124; *Specht*, 306 F.3d at 30 ("An exception to [the duty to read] rule exists when the writing does not appear to be a contract and the terms are not called to the attention of the recipient."). Thus, the duty to read does not morph into a duty to ferret out contract provisions when they are contained in inconspicuous hyperlinks. *See Nguyen*, 763 F.3d at 1179 ("Given the breadth of the range of technological savvy of online purchasers, consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound."). That is

34

particularly so where, as here, the consumer was presented with several documents including the Pre-Sale T&C, the body of the subsequent email, and the Post-Sale T&C, none of them specifically identified as the "Service Contract" governing the purchase, and all containing different sets of terms.

**IV. Starke's Prior Course of Dealing with SquareTrade**

Finally, SquareTrade points to the prior course of dealing between Starke and SquareTrade to demonstrate that Starke was on inquiry notice of terms and conditions that he would receive via email. SquareTrade relies on *Register.com,* 356 F.3d 393, where this Court found that a prior course of dealing between the parties supported the conclusion that they had agreed to certain terms and conditions. In *Register.com*, the party challenging the applicability of the terms and conditions was a sophisticated corporate customer that had made "daily" use of its counter-party's services subject to the terms and conditions, and had been "fully aware" of the terms and conditions that the counter-party sought to enforce. *Id.* at 402. We compared the situation before us then to one in which a person maintains a roadside fruit stand displaying bins of apples with a sign at the exit of the fruit stand telling customers that the apples are 50 cents each. *Id.* at 401. We said that a visitor who comes, takes an apple, bites into it, and does not

see the sign until he exits may well believe he has no obligation to pay for the apple because he had no notice when he bit into it that 50 cents was expected in return. *Id*. However, if the visitor returns to the apple stand on a daily basis, each day taking an apple without paying for it, he cannot later use the same defense. *Id*. Based on his prior transaction(s), he knows full well that the owner is offering apples in exchange for 50 cents. *Id.*

Unlike the apple stand visitor, who learns of the terms governing his contract with the owner and feigns ignorance that the same terms will apply in future transactions, Starke was not put on notice of SquareTrade's terms and conditions through his prior transactions. Although Starke had transacted with SquareTrade on six prior occasions, SquareTrade never gave Starke clear and conspicuous notice that the transaction would subject him to binding arbitration. Each time Starke purchased a SquareTrade protection plan through Amazon, he received a confirmation email from SquareTrade which looked just like the confirmation email at issue here. The fact that Starke received emails with the same inconspicuous hyperlink on more than one occasion does not lead us to conclude that Starke had either actual or inquiry notice of the Post-Sale T&C.

36

On only one occasion (when Starke purchased a SquareTrade protection plan through Staples) did Starke receive an email from SquareTrade in which the terms and conditions were actually provided in the body of the email. In that instance, however, the terms and conditions in the email did not contain an arbitration provision, so that transaction could not have put Starke on notice of such term. Starke notes that when SquareTrade introduced an arbitration clause into its terms and conditions, it pivoted to providing its terms and conditions via a nondescript hyperlink. Thus, the prior course of dealing between Starke and SquareTrade by no means resembles the apple hypothetical in *Register.com*, and it does not convince us that Starke was on inquiry notice of the arbitration provision contained in the Post-Sale T&C.

We emphasize that we in no way hold that the terms of a contract may not be provided by a hyperlinked document. So long as the purchaser's attention is adequately directed to a conspicuous hyperlink that is clearly identified as containing contractual terms to which the customer manifests assent by completing the transaction or retaining the product or service, a hyperlink can be an effective device for specifying contract terms. Nor do we hold that the format used in *Meyer* is the only effective way to use hyperlinks (though we note that the

clean, uncluttered, and conspicuous labeling of the location and binding nature of the terms in the hyperlinked document can be used as a model that this Court has found effective). We hold merely that on the totality of the circumstances in this case, Starke was not on sufficient notice of the terms of the Post-Sale T&C, including its arbitration clause, and therefore did not manifest assent to those terms.

## CONCLUSION

For the reasons stated above, we AFFIRM the order of the district court, denying SquareTrade's motion to compel arbitration.