20-3148, 20-3804, 21-1
Jacqueline Fisher v. Aetna Life Insurance Company

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2021

(Argued: October 20, 2021                                      Decided: April 22, 2022)

Docket Nos. 20-3148, 20-3804, 21-1

_____

JACQUELINE FISHER,

*Plaintiff-Appellant*,

v.

AETNA LIFE INSURANCE COMPANY,

*Defendant-Appellee*.[1]

_____

Before: CALABRESI, POOLER, *Circuit Judges*, and KORMAN,[2] *District Judge*.

Plaintiff-Appellant Jacqueline Fisher appeals from two judgments entered in the United States District Court for the Southern District of New York (Woods, *J.*, and Sullivan, *J.*) granting defendant Aetna Life Insurance Company judgment on breach of contract claims under the Employee Retirement Income Security Act

---

[1] The caption is identical for the three docket numbers.
[2] Judge Edward R. Korman, United States District Court for the Eastern District of New York, sitting by designation.

of 1974 ("ERISA"). Fisher also takes an interlocutory appeal from the non-final order of the United States District Court for the Southern District of New York (Woods, *J.*) granting judgment to Aetna. We heard these appeals in tandem. Fisher contends that the insurance contract between the parties was governed by a document provided on January 9, 2014 instead of February 19, 2014; that she is entitled to a judgment based on Aetna's miscalculation of her copay; that even if the February 19 Document controls, the Patient Protection and Affordable Care Act, 42 U.S.C. § 18022(c)(1) ("ACA"), provides that Aetna must apply the individual out-of-pocket limit rather than the family out-of-pocket limit; and that the brand-generic cost differential Fisher paid for her brand-name medication should count toward her out-of-pocket limit.

We hold that (1) the February 19 document governed the contract of insurance between the parties because Fisher was on inquiry notice as to its terms; (2) Fisher is not entitled to a money judgment for her copay differential; (3) the ACA does not provide that the annual limitation on cost sharing for self-only coverage applies to all individuals regardless of whether the individual is covered under an individual "self-only" plan or is covered by a plan that is other than self-only for plans in effect prior to 2016; and (4) neither the ACA nor the February 19 document required Aetna to apply the brand-generic cost differential charge to Fisher's out-of-pocket limit. We **AFFIRM** the district court judgments.

Affirmed.

_____

WILLIAM DUNNEGAN, Dunnegan & Scileppi LLC (Laura Scileppi, Richard Weiss, *on the brief*), New York, NY, *for Plaintiff-Appellant.*

EVAN YOUNG, Baker Botts L.L.P. (Earl B. Austin, *on the brief*), New York, NY, *for Defendant-Appellee.*

2

POOLER, *Circuit Judge*:

This case arises from three separate but related appeals of Jacqueline Fisher, which we heard in tandem. First, Fisher appeals from the judgment of the United States District Court for the Southern District of New York (Woods, *J.*) granting judgment to Aetna Life Insurance Company on Count I of Fisher's claim for breach of contract under the Employee Retirement Income Security Act of 1974 ("ERISA") regarding her 2014 health insurance plan with Aetna. Second, Fisher appeals from the judgment of the district court (Sullivan, *J.*) granting judgment to Aetna on Fisher's claim for breach of contract under ERISA regarding her 2015 health insurance plan. Third, Fisher takes an interlocutory appeal from the non-final order of the district court (Woods, *J.*) ruling in favor of Aetna on Count II of Fisher's 2014 breach of contract claim under ERISA.

In Fisher's complaint regarding her 2014 health insurance plan, Count I alleged that the document Fisher received on January 9, 2014 ("January 9 Document") was the governing health insurance contract between the parties and Aetna breached that contract by failing to reimburse Fisher for her purchases of EffexorXR, a brand-name antidepressant. Aetna argued that the insurance contract was governed by the terms provided in a document Fisher received on

3

February 19 ("February 19 Document"). The February 19 Document, unlike the January 9 Document, contained a "Choose Generic" clause which required insurees who elected to take a brand-name drug, to pay the price difference between the brand-name drug and its generic equivalent. Count II alleged, in the alternative, that even if the document Fisher received on February 19 governed the health insurance contract between the parties, Aetna had breached that contract by failing to reimburse Fisher for her purchases of EffexorXR. Additionally, for both counts, Fisher alleged that Aetna breached its obligations by failing to pay for Fisher's purchases of EffexorXR after she met her out-of-pocket limit.

The district court (Woods, *J.*) held a bench trial and called its own witnesses. Ultimately, the district court granted judgment to Aetna on Count I. The district court concluded that, because Fisher was on 'inquiry notice,' the February 19 Document governed the contract of insurance between the parties. Because the February 19 Document included a "Choose Generic" clause, Fisher was required to pay the difference between EffexorXR and its generic equivalent. Therefore, Aetna did not breach the contract by charging Fisher for the cost difference between EffexorXR and its generic equivalent. As to Count II, the

4

district court granted partial summary judgment to Aetna holding that Aetna properly applied the family out-of-pocket limit to Fisher's claims and that her purchases of EffexorXR did not count toward her out-of-pocket limit.

Fisher brought a second complaint, this time regarding her 2015 health insurance plan, which largely reprised her allegations in Count II. After remanding to Aetna for a recalculation of Fisher's benefits, the district court (Sullivan, *J.*) granted summary judgment to Aetna holding that Fisher was not entitled to a judgment for her copay differential and that the ACA was ambiguous on whether the individual or family out-of-pocket limit applied to an individual on a family health insurance plan, so the terms of the insurance contract controlled.

Fisher appeals the decisions of the district courts, arguing that the district courts erred in finding that she was on inquiry notice, that she is entitled to a judgment for Aetna's miscalculation of her copay differential, that the ACA provided that the individual out-of-pocket limit applied to her, and that the ACA required Aetna to apply the brand-generic cost differential charge to Fisher's out-of-pocket limit. We conclude the district court properly found that Fisher was on inquiry notice because the terms of the February 19 Document were obvious and

called to Fisher's attention in the January 9 Document as well as through her health insurance broker. We also agree that, because Aetna's decision on remand to award her the copay differential she requested was not arbitrary or capricious, Fisher is not entitled to judgment. Moreover, because the language of the ACA is ambiguous as to whether the individual out-of-pocket limit applies to an individual on an other than self-only plan, we conclude the language of the insurance contract controls and that the controlling regulations mandating otherwise did not go into effect until 2016. Finally, the ACA does not provide that Aetna apply the brand-generic cost differential to Fisher's out-of-pocket limit because her purchases of EffexorXR were not a covered service under the terms of the ACA. Accordingly, we affirm the district courts' grants of summary judgment.

## BACKGROUND

## I. Dunnegan & Scileppi's Health Insurance Plans

Fisher is the spouse of William Dunnegan, a name partner at Dunnegan & Scileppi LLC ("D&S"), a New York based law firm. D&S offers health insurance coverage to its employees (such as Dunnegan) and their beneficiaries (such as Fisher) through a small business group insurance policy. In 2013, D&S had health

insurance coverage through a policy issued by Oxford Health. Fred Warner, an independent insurance broker who assisted D&S with selecting a group health insurance policy, advised D&S that the Oxford policy was up for renewal, but the deductible was projected to increase for 2014. Dunnegan worked with Warner to find a new group health insurance plan for the firm. On November 25, 2013, Warner sent Dunnegan an email attaching a summary chart of various group health plans for 2014. As an insurance broker, Warner had access to various plan documents and details through multiple sources. D&S ultimately selected a small business group plan from Aetna known as the Aetna New York "Silver OAMC 2000 80/60 HSA PY" ("2014 Aetna NY Silver Plan").

Under New York law, the Department of Financial Services ("DFS") regulates small business group health insurance plans in New York and all health insurance providers are required to submit their small business policies for DFS review and approval. DFS approved of the 2014 Aetna NY Silver Plan in October 2013. Once approved, Aetna could not lawfully change the terms of the plan without DFS approval.

On December 18, 2013, D&S and each of its six employees sent completed applications for the 2014 Aetna NY Silver Plan to Warner. The application that

7

Dunnegan executed on behalf of D&S contained, among other things, the following provisions:

> The plan documents, including the policy and certificate, will determine the contractual provisions, including procedures, exclusions, and limitations relating to the plan and will govern in the event they conflict with any benefits comparison, summary or other description of the plan.
>
> . . .
>
> . . . . I understand that this application will form a part of the Group Agreement or Group Policy issued by Aetna, and by my signature below I agree to be bound by the terms and conditions of that Group Agreement or Group Policy.

No. 20-3148, App'x at 126.

## II.    January 9 Document and February 19 Document

On January 8, 2014, Aetna sent Warner an email to inform him that Aetna had approved D&S's application. On January 9, 2014, Aetna sent D&S a five-page document titled "Final Rates." This document contained general information about the 2014 Aetna NY Silver Plan that D&S selected, including the total monthly premium, coinsurance levels, and deductible. The January 9 Document disclosed that "[t]his preliminary rate sheet should be read in conjunction with the more detailed benefit descriptions, exclusions and

8

limitations, and underwriting guidelines contained in your product brochures. For more information, please contact your licensed Agent or Sales Representative." No. 20-3148, App'x at 162. There were no other files attached to the January 9 Document. Warner testified that the January 9 Document "obviously" did not have every term and condition associated with the 2014 Aetna NY Silver Plan. No. 20-3148, App'x at 88, at 98:19-23. At trial, Dunnegan testified that "when I originally got the [January 9 Document] handed to me by [the office manager] on January 9th, my initial reaction was there's more to this; where's the rest of it?" No. 20-3148, App'x at 110, at 482:20-22. D&S sent the executed document to Aetna on January 9, 2014.

On February 19, Aetna mailed a form letter to D&S enclosing a document purporting to be a group insurance policy. The February 19 Document did not deviate from the model language approved by DFS. Before February 19, 2014, the draft of the February 19 Document existed only in electronic form and was not publicly available. But detailed information about the plan was available to Aetna employees beginning in November 2013, after the plans had been approved by DFS. Aetna employees could access this information to answer questions about benefits under the 2014 Aetna NY Silver Plan.

9

## III. Fisher's EffexorXR Prescription

The February 19 Document included the following clause:

> An additional charge may apply when a Prescription Drug on a higher tier is dispensed at Your or Your Provider's request, when a chemically equivalent Prescription Drug is available on a lower tier unless We approve coverage at the higher tier. You will have to pay the difference between the cost of the Prescription Drug on the higher tier and the cost of the Prescription Drug on the lower tier. The cost difference must be paid in addition to the lower tier Copayment or Coinsurance.

No. 20-3148, App'x at 334. This is widely known in the health insurance industry as a "Choose Generic" provision. Under a Choose Generic provision, a member must first try the generic version of a medication before Aetna will approve the brand-name equivalent. If the member chooses the brand-name drug, without a waiver of the Choose Generic requirement, then the member must pay an additional charge equal to the difference in cost between the brand-name and the generic. The member can request a waiver of the Choose Generic provision, but Aetna requires the member's doctor to provide documentation showing that the brand-name drug is medically necessary. This Choose Generic clause was not present in the January 9 Document.

Fisher suffered from severe recurrent major depression and was prescribed EffexorXR. EffexorXR is a brand-name drug for which a generic, venlafaxine, exists. The Aetna Formulary, Aetna's prescription drug guide, classified EffexorXR as a Tier 3 drug, which meant it was subject to the Choose Generic provision. The cost of a 30-day supply of EffexorXR ranged from $350-$500 while the cost of venlafaxine was $35. Fisher submitted a prescription for EffexorXR on January 29, 2014, but Aetna declined to cover Fisher's EffexorXR prescription. Fisher's doctor submitted a form requesting Aetna cover EffexorXR which Aetna then approved. Importantly, however, Aetna did not waive the additional charge applicable to the brand-name drug. Aetna acknowledged that EffexorXR was "approved for coverage" but did not approve additional reimbursement for it. No. 20-3148, App'x at 63-64, ¶ 79. This approval allowed Fisher to purchase EffexorXR at her pharmacy at Aetna's negotiated price, but did not permit Fisher to receive reimbursement for her purchases.

Fisher's pharmacy submitted claims to Aetna on behalf of Fisher for the price of EffexorXR. Aetna created records showing that Fisher had to pay for the prescription and posted the records to a website accessible to Fisher. The

11

maximum amount Fisher's family paid for medical products or services in 2014 that could count toward their out-of-pocket limit was $8,951.14.

Fisher continued to purchase EffexorXR in 2015 when she was on a new health policy administered by Aetna. The 2015 policy contained the same Choose Generic clause as the February 19 Document. Aetna applied the full cost of Fisher's January, February, March, and April purchases of EffexorXR ($540.11 each) to her 2015 deductible. Fisher asserts she met her deductible on May 4, 2015, but Aetna did not reimburse her for any costs after that date. On August 31, 2015, Fisher's purchase of EffexorXR took her annual medical spending over $6,000 which she alleges is above her out-of-pocket limit, but Aetna still refused to cover Fisher's purchases of EffexorXR for the rest of 2015.

## IV.    Fisher's Appeal Within Aetna

In August 2014, Dunnegan and Warner contacted Aetna about its decisions concerning coverage of EffexorXR. Aetna informed them that if Fisher and her doctor submitted a medical-necessity waiver of the Choose Generic clause, Aetna may approve and cover EffexorXR retroactively. Dunnegan initially sent a fax to Fisher's doctor, Dr. Rosenfeld, requesting he call Aetna, but just two days later, sent another fax instructing Dr. Rosenfeld to disregard the

previous one because "Aetna has no interest in making an honest interpretation of its policy and . . . talking to [Aetna] is a waste of time." No. 20-3148, App'x at 416. Dunnegan, instead, submitted an appeal within Aetna on September 8, 2014. Aetna denied the appeal and instead of filing a second-level appeal, Fisher sued Aetna on behalf of herself and all others similarly situated.

## V. Procedural History

### A. Fisher's First Suit - 2014 Health Insurance Plan

#### 1. Initial Proceedings

On January 15, 2015, Fisher filed a complaint against Aetna asserting two claims for damages under ERISA. Count I alleged that the January 9 Document was the governing health insurance contract between the parties and that Aetna had breached that contract by failing to reimburse Fisher for her purchases of EffexorXR. Count II alleged, in the alternative, that even if the February 19 Document governed the health insurance contract between the parties, Aetna breached that contract by failing to reimburse Fisher for her purchases of EffexorXR. Additionally, for both counts, Fisher alleged that Aetna breached its obligations by failing to pay for Fisher's purchases of EffexorXR after she met her out-of-pocket limit.

13

The parties moved for summary judgment. On July 29, 2016, the district court (Woods, *J.*) denied Fisher's summary judgment motion. The district court conducted a bench trial and called its own witnesses. The court called three witnesses from March 8, 2017 to March 10, 2017: (1) Warner; (2) Karen Pribush, a former Aetna employee; and (3) Dunnegan.

## 2. Count I

On May 29, 2020, the district court issued a decision, making various findings of fact and concluding that Aetna was entitled to judgment on Fisher's first breach of contract claim. *Fisher v. Aetna Life Ins. Co.* ("*Fisher I*"), No. 1:15-CV-283-GHW, 2020 WL 2792994, at *13 (S.D.N.Y. May 29, 2020). The court did not rule on Count II of Fisher's claim for breach of the February 19 Document because Aetna had not moved for judgment on that claim.

The factual determinations by the district court included finding Warner's testimony that he could not retrieve a summary of benefits of the health insurance plan not credible, finding Dunnegan's belief that the January 9 Document constituted D&S's entire Aetna insurance policy not credible, and finding that Dunnegan and D&S were on inquiry notice of the terms of the February 19 Document after they received the January 9 Document. The court

14

found that Aetna intended to offer an insurance contract with the terms of the February 19 Document, it was obvious to D&S that Aetna had offered to provide health insurance on the terms set forth in the February 19 Document, and D&S could have learned the "material terms" of the February 19 Document by calling Aetna. *Fisher I*, 2020 WL 2792994, at *8.

### 3. Count II

With respect to Fisher's second claim that Aetna breached the terms of the February 19 Document, the district court (Woods, *J.*) issued a memorandum opinion and order on August 12, 2020. *Fisher v. Aetna Life Ins. Co.* ("*Fisher II*"), 478 F. Supp. 3d 489, 491 (S.D.N.Y. 2020). The district court granted partial summary judgment to Fisher because Aetna charged Fisher more than it should have when it applied the coinsurance applicable to non-preferred brands instead of the lower copay applicable to generic drugs once Fisher met her deductible which amounted to a difference of $179.76. Aetna conceded it had miscalculated the coinsurance/copayment scheme for Fisher's EffexorXR prescriptions. The district court dismissed the remainder of Count II, concluding that the ACA did not require insurers to apply the individual out-of-pocket limit to individuals on family health insurance plans and that Fisher's purchases of EffexorXR were not

15

a covered service under the ACA. However, the district court certified the

questions concerning the out-of-pocket limit under the ACA for interlocutory

review pursuant to 28 U.S.C. § 1292(b).[3] This interlocutory appeal is docket no.

21-1-cv.

### B.   Fisher's Second Suit – 2015 Health Insurance Plan

#### 1. Remand to Aetna

On January 8, 2016, Fisher brought another complaint against Aetna,

largely reiterating Count II from her first complaint. The parties filed cross-

motions for summary judgment. On March 31, 2017, a few weeks after the bench

trial concluded for Fisher's first complaint, another district court (Sullivan, *J.*)

---

[3] Because Fisher intended to move for class certification regarding the partial relief she was granted by the district court (Woods, *J.*) in its August 13, 2020 order, the district court did not enter judgment on Fisher's second claim at the time. However, the district court did not delay entering judgment on Fisher's first claim because of the potential inefficiencies that could result if Fisher successfully certified a class under her second claim which assumed the February 19 Document is the binding contract. If this Court reversed the district court's finding that the February 19 Document is a binding contract, then that would have required the decertification of a class based on the February 19 Document and the certification of a new class based upon the January 9 Document. To avoid such inefficiencies, the district court issued a Rule 54(b) certification for Fisher's Count I claim and certified the entirety of the district court's decision on Count II for interlocutory appeal under 28 U.S.C. § 1292(b).

granted Fisher partial summary judgment on her second complaint. The district court held that Aetna's denial of Fisher's request for coverage of her purchases of EffexorXR was arbitrary and capricious. *Fisher v. Aetna Life Ins. Co.*, No. 16-CV-144 (RJS), 2017 WL 1246133, at *6 (S.D.N.Y. Mar. 31, 2017). However, rather than grant Fisher an award, the district court vacated Aetna's denial of benefits and remanded to Aetna for reconsideration of Fisher's claims. *Id.*

On remand, Aetna, among other things, reversed its decision not to reimburse Fisher for the copay differential—the difference between the cost of venlafaxine ($18.04 per month) and the copayment for venlafaxine ($10 per month), totaling $64.32 for the period between May and December 2015. Additionally, Aetna determined it mistakenly applied the Choose Generic cost differential—the difference between EffexorXR's cost and venlafaxine—to her deductible which provided Fisher an unwarranted windfall by allowing her to meet her deductible earlier than she would have otherwise. However, Aetna decided not to reverse the miscalculation of Fisher's deductible. On April 30, 2018, Aetna mailed a check for $64.32 to Fisher's attorney, and did so again on May 1, 2018. Fisher's attorney returned both checks without depositing them.

**2. March 31, 2019 Order**

17

On April 16, 2018, Fisher filed another motion for summary judgment arguing that she was entitled to a judgment of $64.32, that her prescription for EffexorXR was medically necessary and should have been covered, and that she was entitled to all amounts she spent in excess of her out-of-pocket limit. Aetna filed a cross-motion for summary judgment.

On March 31, 2019, the district court (Sullivan, *J.*) denied Fisher's motion in its entirety and granted summary judgment to Aetna. *Fisher v. Aetna Life Ins. Co.* ("*Fisher III*"), No. 16-cv-144 (RJS), 2019 U.S. Dist. LEXIS 233798, at *20 (S.D.N.Y. Mar. 31, 2019). The district court held that the deferential standard under ERISA precludes a judgment in favor of Fisher because Aetna agreed to pay the copay differential of $64.32. *Id.* at *18. The court found Aetna had already sent Fisher two checks for that amount and granted her the exact relief she requested, so Aetna's decision was not arbitrary and capricious. *Id.* Second, the district court held that the 2015 insurance contract clearly indicated that the family out-of-pocket limit applied to Fisher. *Id.* at *14-15. In response to Fisher's alternative argument that the ACA required Aetna to apply the lower, individual limit, the district court held that the clear language of the policy applies. *Id.* at *17. The district court did not reach the issue of whether EffexorXR was approved as

"medically necessary" and should have been reimbursed after Fisher met the out-of-pocket limit because Fisher did not meet the out-of-pocket limit for her family plan in 2015. *Id.* at *19-20.

### 3. Motion for Reconsideration

Fisher then moved for reconsideration of the district court's March 31, 2019 order, arguing that the court erred in its interpretation of the ACA and that she is entitled to a judgment against Aetna for the copay differential of $64.32. On October 5, 2020 the district court (Sullivan, *J.*) denied Fisher's motion for reconsideration. *Fisher v. Aetna Life Ins. Co.*, No. 16-CV-144 (RJS), 2020 WL 5898788 (S.D.N.Y. Oct. 5, 2020). The district court concluded that the ACA does not speak to whether the individual or family out-of-pocket limit applies to an individual covered by a family policy. The district court considered a final rule ("2015 Rule") passed by the U.S. Department of Health and Human Services ("HHS"). HHS determined that, beginning in 2016, insurance providers could not require any individual, including those with family coverage, to spend more than the individual out-of-pocket limit established under the Act – a limitation commonly known as an "embedded individual out-of-pocket limit." *Fisher*, 2020 WL 5898788, at *4. Significantly, the district court held that the 2015 Rule was a

19

legislative rule instead of an interpretive rule, and therefore, it did not apply

retroactively to Fisher's 2014 and 2015 health insurance plans. Accordingly, the

plain text of the 2015 health insurance plan controlled, and the plan clearly stated

Fisher was obligated to meet the family out-of-pocket limit.

## DISCUSSION

### I. Standard of Review

We review a district court's grant or denial of summary judgment de novo.

*Rivkin v. Century 21 Teran Realty LLC*, 494 F.3d 99, 103 (2d Cir. 2007). For issues

concerning statutory interpretation, such as the interpretation of 42 U.S.C. §

18022, the standard of review is also de novo. *United States v. Epskamp*, 832 F.3d

154, 160 (2d Cir. 2016).

Additionally, we review de novo a district court's determination that the

parties agreed to a contract. *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*,

999 F.3d 828, 833 (2d Cir. 2021); *see also Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir.

1996) ("The central issue—whether, based on the factual findings, a binding

contract existed—is a question of law that we review de novo."). However, we

review a district court's findings of fact bearing on this question under a "clearly

erroneous" standard. *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 26 (2d Cir.

2002). A district court's findings of fact pursuant to a bench trial, "whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge [] the credibility of the witnesses." *Presley v. U.S. Postal Serv.*, 317 F.3d 167, 174 (2d Cir. 2003) (citing Fed. R. Civ. P. 52(a)). A finding of fact is "clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985) (internal citation and internal quotation marks omitted).

## II. Governing Contract for Insurance

The primary issue on Fisher's first appeal is whether the January 9 or February 19 Document was the governing contract of insurance between D&S and Aetna. The parties agree that a contract of insurance existed between D&S and Aetna for the policy year 2014, but disagree as to whether the January 9 Document is the governing policy, as Fisher claims, or the February 19 Document is the governing policy, as Aetna claims.

"It is a basic tenet of contract law that, in order to be binding, a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'" *Starke*

*v. SquareTrade, Inc.*, 913 F.3d 279, 288-89 (2d Cir. 2019) (quoting *Express Indus. &*

*Terminal Corp. v. N.Y. Dep't of Transp.*, 93 N.Y.2d 584, 589 (N.Y. 1999)). "The

manifestation of mutual assent must be sufficiently definite to assure that the

parties are truly in agreement with respect to all material terms." *Id.* at 289. As a

general matter, courts look to the basic elements of the offer and acceptance to

determine if there was an objective meeting of the minds sufficient to create a

binding and enforceable contract. *See Express Indus.*, 93 N.Y.2d at 589.

"Where an offeree does not have *actual* notice of certain contract terms, he

is nevertheless bound by such terms if he is on inquiry notice of them and

assents to them through conduct that a reasonable person would understand to

constitute assent." *Starke*, 913 F.3d at 289 (emphasis in original). "In determining

whether an offeree is on inquiry notice of contract terms, New York courts look

to whether the term was obvious and whether it was called to the offeree's

attention." *Id.* "While it may be the case that many users will not bother reading

the additional terms, that is the choice the user makes; the user is still on inquiry

notice." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 79 (2d Cir. 2017).

The district court (Woods, *J.*) found that Dunnegan was on inquiry notice

of the terms of the February 19 Document. *Fisher I*, 2020 WL 2792994, at *7. We

22

review this factual finding for clear error. *See Healy v. Rich Prod. Corp.*, 981 F.2d 68, 73 (2d Cir. 1992) ("A district court's findings with respect to the expression of the contracting parties' intent will not be disturbed unless they are clearly erroneous."); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 238 (2d Cir. 2016) ("Whether particular notice was reasonable is ordinarily a question of fact for the jury."). "Under the clear error standard, we may not reverse [a finding] even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently." *Atl. Specialty Ins. Co. v. Coastal Env't Grp. Inc.*, 945 F.3d 53, 63 (2d Cir. 2019) (alterations in original) (internal citations and quotations marks omitted).

We agree with the district court's (Woods, *J.*) finding that Fisher had reasonable notice of the terms of the February 19 Document. Under New York law, DFS regulates small business group health insurance plans in the state. Aetna was required to submit all of its New York small business policies for 2014 to DFS for approval. DFS approved the language of the 2014 Aetna NY Silver Plan on October 21, 2013. When Dunnegan signed and returned the January 9 Document, DFS had already approved of the language of the 2014 Aetna NY Silver Plan. The language of the February 19 Document did not differ from the

23

language approved by New York state in October 2013, so the terms of the insurance plan existed as of October 21, 2013.

To determine whether D&S had inquiry notice of the terms of the February 19 Document, we consider whether the terms were "obvious" and "called to [D&S's] attention." *Starke*, 913 F.3d at 289. "This often turns on whether the contract terms were presented to the offeree in a clear and conspicuous way." *Id.*

The January 9 Document that D&S signed and executed stated that "[t]his preliminary rate sheet should be read in conjunction with the more detailed benefit descriptions, exclusions and limitations, and underwriting guidelines contained in your product brochures. For more information, please contact your licensed agent or Sales Representative." No. 20-3148, App'x at 162. Additionally, the January 9 Document stated that D&S was purchasing an "NY Silver OAMC 2000 80/60 HSA PY" with plan ID 14018895. No. 20-3148, App'x at 160. Furthermore, D&S employees filled out applications for insurance with Aetna in December 2013 that stated "[t]he plan certificate of coverage will determine the rights and responsibilities of member(s). It will govern in the event they conflict with any benefits comparison, summary or other description of the plan." No. 20-3148, App'x at 129. The same application also included the following

24

language: "I understand that this application will form a part of the Group Agreement or Group Policy issued by Aetna, and by my signature below I agree to be bound by the terms and conditions of that Group Agreement or Group Policy." No. 20-3148, App'x at 126. Additionally, Dunnegan signed the contract with Oxford Health for D&S's health insurance for 2013. That insurance plan was over 140 pages. In contrast, the January 9 Document is only five pages. Because the January 9 Document repeatedly indicated that additional terms existed and because Dunnegan, as a sophisticated party, was aware that the January 9 Document was incredibly short relative to the prior contract of insurance that he signed, it is "obvious" that the 2014 Aetna NY Silver Plan included additional terms than those found in the January 9 Document.

Put simply, the terms of the February 19 Document were clearly called to D&S's attention. Both the application for insurance and the January 9 Document indicated that additional terms existed. At any point, D&S could have called Aetna and requested the additional terms because the language of the plan had already been approved by DFS.

The district court's factual findings on inquiry notice are sound and far from the clear error required for this Court to reverse. *See Anderson*, 470 U.S. at

25

573–74 ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."). We agree with the district court that the terms of the February 19 Document were obvious and were called to D&S's attention. Therefore, Fisher, through D&S, was on inquiry notice of the terms of the February 19 Document and the February 19 Document governs the contract of insurance between the parties.[4]

Fisher's arguments to the contrary are unavailing. She argues that inquiry notice cannot apply in this case, relying on *Starke*, 913 F.3d 279. In *Starke*, the plaintiff bought a protection plan online for his CD player. *Id.* at 282. SquareTrade sent Starke a service contract via email containing a chart setting forth the material terms of the protection plan. *Id.* at 284. The body of the email

---

[4] We note, however, that, under New York law, inquiry notice calls for a highly fact-specific inquiry. *See, e.g.*, *Blossom v. Dodd*, 4 Hand 264 (N.Y. 1870); *Tri-City Renta-Car v. Vaillancourt*, 304 N.Y.S.2d 682 (N.Y. App. Div. 1969). Accordingly, its application may not be appropriate in cases where the circumstances materially differ from those at issue here, where, for example, the offeree is an unsophisticated party, or where the relevant terms are not diligently and conspicuously called to the offeree's attention by the offeror.

did not refer to arbitration, and the email "did not contain or refer to any attachments." *Id.* at 285-86. The bottom of the e-mail included a hyperlink to "Terms and Conditions" which contained an arbitration clause. *Id.* at 285. SquareTrade never directed Starke's attention to the Terms and Conditions hyperlink that contained the arbitration clause. Additionally, we found that the SquareTrade email did not signal to Starke that he should click on the link, and that he would be agreeing to the contract terms in the document to be found by clicking the hyperlink. *Id.* at 293. We held that based on the totality of the circumstances, Starke did not have inquiry notice of the arbitration clause.

*Starke* is readily distinguishable. *Starke* involved an online consumer contract, not a small business health insurance plan. D&S was a sophisticated party who used a broker, Warner, to determine the best health insurance plan for them. Both D&S and Warner should have realized that the five-page January 9 Document could not possibly contain the full terms of the insurance contract. Unlike *Starke*, this case did not involve a hidden arbitration clause tucked away in a hyperlink. Here, the application for insurance and the January 9 Document stated on their face that additional terms existed. As the district court found, "it

is not credible that Dunnegan believed the [January 9] document constituted his entire Aetna insurance policy." *Fisher I*, 2020 WL 2792994, at \*6.

Fisher also argues that the district court erred in its interpretation of New York Insurance Law § 3204. Section 3204 states: "Every policy of life, accident or health insurance, or contract of annuity, delivered or issued for delivery in this state, shall contain the entire contract between the parties, and nothing shall be incorporated herein by reference to any writing, unless a copy thereof is endorsed upon or attached to the policy or contract when issued." N.Y. Ins. Law § 3204(a)(1). But this subsection "does not apply to a table or schedule of rates, premiums or other payments which is on file with the superintendent for use in connection with such policy or contract." *Id.* § 3204(b).

Fisher argued below that the contract Aetna provided violated New York law because New York law states that all contracts for insurance must contain the full terms of the contract, unless a contract is a "schedule of rates" "on file" with the state. Fisher argues that the January 9 Document did not fit this exception because it was not on file with the state, and that Aetna therefore violated Section 3204. The district court held that the exception in Section 3204(b)

applied because the January 9 Document was a "schedule of rates" that was on file with the state.

Fisher is incorrect. The actual rates from the 2014 Aetna NY Silver Plan were on file with DFS. At trial, Karen Pribush, an Aetna sales manager, testified that the rates in the January 9 Document were filed with the State of New York for the plan at issue here. Additionally, Aetna's 2014 rate filing is publicly available on the DFS website, which shows that the rates for the 2014 Aetna NY Silver Plan were filed in May 2013.[5] Therefore, the January 9 Document was a "schedule of rates" "on file with" DFS, and the exception in Section 3204(b) applies.

### III. Copay Differential Judgment

The district court (Sullivan, *J.*) held that Fisher is not entitled to a judgment for her copay differential because Aetna's decision was not arbitrary or capricious. *Fisher III*, 2019 U.S. Dist. LEXIS 233798, at *19. "[W]hen the terms of a

---

[5] *See* N.Y. Dep't of Fin. Servs., Filing at a Glance: Aetna Life Ins. Co. 1, 210-11, https://myportal.dfs.ny.gov/documents/538523/1230191/Aetna+Life+ Insurance+Co.+NY_SG+EPO_AETN-128993202.pdf. "[W]e may properly take judicial notice of this document . . . because [it] is publicly available and its accuracy cannot reasonably be questioned." *Apotex Inc. v. Acorda Therapeutics*, Inc., 823 F.3d 51, 60 (2d Cir. 2016).

plan grant discretionary authority to the plan administrator, a deferential standard of review remains appropriate even in the face of a conflict." *Conkright v. Frommert*, 559 U.S. 506, 512 (2010). Applying this standard, an administrator abuses its discretion where its decision was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002) (internal citations and quotation marks omitted). Under ERISA, "a plan administrator's decision is intended to be final—within the bounds of the highly deferential arbitrary-and-capricious standard—and not merely an input with the potential to assist the Court in making the ultimate determination." *Roganti v. Metro. Life Ins. Co.*, 786 F.3d 201, 217 (2d Cir. 2015) (internal citation and internal quotation marks omitted.)

Here, Aetna agreed to pay Fisher the copay differential of $64.32. She did not argue below, and does not attempt to argue on appeal, that this decision was arbitrary and capricious because the parties agreed that the benefits determination correctly construed the policy. *Fisher III*, 2019 U.S. Dist. LEXIS 233798, at *18. Put simply, there is no reason to upend Aetna's administrative decision to provide Fisher with the relief that she requested. Although Fisher

would like to receive a judgment granting her the exact relief that Aetna has already thrice attempted to provide, Fisher is not entitled to such a judgment.[6]

## IV.    Out-of-Pocket Limit Under the Affordable Care Act

### A.    Statutory Text

In *Fisher III*, the district court (Sullivan, *J.*) held that Fisher was required to satisfy the family out-of-pocket limit under the terms of the insurance plan, rejecting Fisher's argument that she need only reach the individual limit. First, the district court held that the plain meaning of the health insurance contract indicates that the family out-of-pocket limit applied to Fisher's claims. *Fisher III*, 2019 U.S. Dist. LEXIS 233798, at \*13. Second, the district court (Sullivan, *J.*), on Fisher's motion for reconsideration, held that its decision comported with the ACA's cost-sharing provision found at 42 U.S.C. § 18022(c). *Fisher*, 2020 WL 5898788, at \*6. Fisher argues that the district court erred in its statutory

---

[6] Aetna provided Fisher with two checks for $64.32. Fisher returned both, presumably because she was concerned the language accompanying the checks could have been construed as a settlement of her claims. Following the district court's lead, Aetna sent a new check to Fisher, who declined to cash that check as well.

interpretation in her appeals concerning both the 2014 and 2015 health insurance plans.

To determine whether the ACA requires individuals to meet the individual out-of-pocket limit even where those individuals are part of a family plan, "we start our analysis . . . with the language of the statute." *Tanvir v. Tanzin*, 894 F.3d 449, 459 (2d Cir. 2018) (ellipses in original) (quoting *Chai v. Comm'r of Internal Revenue*, 851 F.3d 190, 217 (2d Cir. 2017)). "Where the statutory language provides a clear answer, our analysis ends there." *Id.* (citation and internal punctuation omitted). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

42 U.S.C. § 18022(c)(1)(A) provides:

> The cost-sharing incurred under a health plan with respect to self-only coverage or coverage other than self-only coverage for a plan year beginning in 2014 shall not exceed the dollar amounts in effect under section 223(c)(2)(A)(ii) of Title 26 for self-only and family coverage, respectively, for taxable years beginning in 2014.

26 U.S.C. § 223(c)(2), concerning "High deductible health plan[s]," provides:

> (A) In general.—The term 'high deductible health plan' means a health

plan—

    (i) which has an annual deductible which is not less than—

        (I) $1,000 for self-only coverage, and

        (II) twice the dollar amount in subclause (I) for family coverage, and

    (ii) the sum of the annual deductible and the other annual out-of-pocket expenses required to be paid under the plan (other than for premiums) for covered benefits does not exceed—

        (I) $5,000 for self-only coverage, and

        (II) twice the dollar amount in subclause (I) for family coverage.

The district court (Sullivan, *J.*) concluded that the ACA is silent on the question of which limit – individual or family – applies to an individual covered under a family policy. We agree. The text of the ACA does not provide any direction about whether the individual or family limit applies to an individual covered by a family policy. Therefore, we turn to the applicable regulations for guidance.

**B.    2015 Rule**

On February 27, 2015, HHS passed a final rule (the "2015 Rule") concerning benefit and payment parameters for health insurance plans in 2016:

> Lastly, in the proposed rule, we proposed clarifying that the annual limitation on cost sharing for self-only coverage applies to all individuals regardless of whether the individual is covered by a self-only plan or is covered by a plan that is other than self-only. In both of these cases, an individual's cost sharing for [essential health benefits] may never exceed

33

the self-only annual limitation on cost sharing. For example, under the *proposed 2016 annual limitation on cost sharing*, if an other than self-only plan has an annual limitation on cost sharing of $10,000 and one individual in the family plan incurs $20,000 in expenses from a hospital stay, that particular individual would only be responsible for paying the cost sharing related to the costs of the hospital stay covered as [essential health benefits] up to the annual limit on cost sharing for self-only coverage (assuming an annual limitation of $6,850 for 2016, the maximum for that year). We sought comments on these proposed requirements and clarifications as well as whether other requirements and clarifications were needed. *We are finalizing our proposal that the annual limitation on cost sharing for self-only coverage applies to all individuals regardless of whether the individual is covered by a self-only plan or is covered by a plan that is other than self-only* and the technical correction we proposed to make to the text at § 156.130(c).

Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2016, 80 Fed. Reg. 10750 (Feb. 27, 2015) (emphasis added). HHS determined that insurance providers could not require an individual on a family plan to spend more than the individual out-of-pocket limit established under the ACA. This reading of the ACA comports with Fisher's argument that she needed to only meet the individual out-of-pocket limit even though she was on a family plan. However, HHS made clear in the 2015 Rule that the regulation applied only in 2016 and onward. *See id.* ("[U]nder the proposed 2016 annual limitation on cost sharing . . ."); *see also* 80 Fed. Reg. at 10825 ("We note that 2016 plans must comply with this policy.").

The question, then, is whether the 2015 Rule can be applied retroactively to Fisher's 2014 and 2015 health insurance plans. To determine that, we must answer whether the 2015 Rule is a legislative or interpretive rule. Whether a rule is legislative or interpretive implicates whether the rule can be given retroactive effect. "The distinction between legislative and interpretive rules derives from the Administrative Procedure Act." *Sweet v. Sheahan*, 235 F.3d 80, 90 (2d Cir. 2000). Generally speaking, "[r]etroactivity is not favored in the law." *City of New York v. Permanent Mission of India to the United Nations*, 618 F.3d 172, 192 (2d Cir. 2010) (quoting *Sweet*, 235 F.3d at 89). This is because retroactivity creates unfairness by upending "legitimate expectations and upset[ting] settled transactions." *Rock of Ages Corp. v. Sec'y of Lab.*, 170 F.3d 148, 158 (2d Cir. 1999); *see also Barenboim v. Starbucks Corp.*, 698 F.3d 104, 113 (2d Cir. 2012) (suggesting that a regulation would "raise a retroactivity concern" where it "attach[ed] new penalties or other legal consequences to actions preceding [its] promulgation"). However, these reasons do not apply with the same force to interpretive rules, which merely explain the meaning of an ambiguous statute. *Blake v. Carbone*, 489 F.3d 88, 98–99 (2d Cir. 2007); *see also Barenboim*, 698 F.3d at 113 (suggesting that a distinction exists between legislative and interpretive rules for purposes of

retroactivity because an interpretive rule merely "clarif[ies] the meaning of an ambiguous statute").

A legislative rule "'grants rights, imposes obligations, or produces other significant effects on private interests,'" while an interpretive rule is an agency's "'intended course of action, its tentative view of the meaning of a particular statutory term, or internal house-keeping measures organizing agency activities.'" *White v. Shalala*, 7 F.3d 296, 303 (2d Cir. 1993) (quoting *Perales v. Sullivan*, 948 F.2d 1348, 1354 (2d Cir. 1991)). "The central question is essentially whether an agency is exercising its rule-making power to clarify an existing statute or regulation, or to create new law, rights, or duties in what amounts to a legislative act." *Id.*

We agree with the district court that the 2015 Rule is legislative and should not apply retroactively. The 2015 Rule "change[d] the law." *Blake*, 489 F.3d at 98. The Act is silent on whether the family out-of-pocket limit or individual out-of-pocket limit should apply to an individual covered by a family plan. *See* 42 U.S.C. § 18022(c)(1)(B). "The extent and nature of the ambiguities" in the ACA on this topic suggest "that the statute itself does not create [embedded cost-sharing requirements] and reinforce the conclusion that the [2015 Rule is] legislative."

36

*Sweet*, 235 F.3d at 92; *see also Chamber of Com. v. OSHA*, 636 F.2d 464, 469 (D.C. Cir. 1980) ("Congress has not legislated and indicated its will on th[is] question . . . therefore the Administration must have done more than exercise its power to fill up the details." (internal quotation marks omitted)). It follows, then, that before the 2015 Rule was issued, insurers regularly required individuals on family plans to meet the family out-of-pocket limit. *See* 80 Fed. Reg. at 10,824–25 (acknowledging that this "clarification" would effectively alter the types of health insurance policies that insurers are permitted to offer). Furthermore, before the 2015 Rule was promulgated, no federal agency or court read the Act's cost-sharing provision to require embedded cost-sharing.

Additionally, the actions of HHS and other agencies demonstrate that the 2015 Rule was legislative. First, the rule was enacted through the notice-and-comment process. *Compare* Patient Protection & Affordable Care Act; HHS Notice of Benefits & Payment Parameters for 2016, 79 Fed. Reg. 70,674, 70,723 (Nov. 26, 2014), *with* 80 Fed. Reg. at 10,824 ("We sought comments on these proposed requirements and clarifications as well as whether other requirements and clarifications were needed."). The notice-and-comment process is typically reserved for legislative rules. *See Gonnella v. United States Sec. & Exch. Comm'n*,

954 F.3d 536, 546-47 (2d Cir. 2020) ("Such 'legislative rules,' which must go through Notice and Comment procedures, have 'legal effect.'") (quoting *Sweet*, 235 F.3d at 91)); *Sweet*, 235 F.3d at 93 ("Had the agencies been engaged in interpretive rulemaking, they would have been exempt from the notice-and-comment provisions.").

Second, HHS indicated that the rule should be enforced only prospectively. *See* 80 Fed. Reg. at 10,825 ("We note that 2016 plans must comply with this policy."). Providing that the rule should only be enforced prospectively indicates that the 2015 Rule changes the existing legal landscape and requires a phase-in period to allow market participants time to reorient their relationships. *Cf. Sweet*, 235 F.3d at 92 (acknowledging that when Congress requires a delay between the time regulations are promulgated and when they become effective, it is because Congress "anticipate[s] that the agenc[y] w[ill] institute new legal obligations—that the agenc[y] w[ill] engage in legislative rulemaking"). If the agencies believed that the text of the ACA required the 2015 Rule's interpretation, they likely would have said so. Instead, the agencies explicitly chose to defer the rule's implementation, which suggests the agencies did not believe the ACA's operation rested on the 2015 Rule's interpretation. As the

district court (Woods, *J.*) determined: "The 2015 Rule says that pre-2016 plans need *not* comply with its interpretation. But Fisher argues that aggrieved consumers were permitted to sue based on the same interpretation. That is an odd result. If the Departments intended to open the door to private lawsuits based on their interpretation, they probably would have said something to that effect. But they did not. Indeed, Fisher has pointed to nothing in the 2015 Rule or elsewhere to support her interpretation." *Fisher II*, 478 F. Supp. 3d at 498-99 (emphasis in original).

Fisher argues that the 2015 Rule itself declares it was a "clarification" so it must be interpretive. We regularly defer to an agency's views on whether its rules are legislative or interpretive. *See Huberman v. Perales*, 884 F.2d 62, 67 (2d Cir. 1989) ("It is of course true that courts should give weight to an agency's interpretation of the statutes it administers."). But we are not obligated to abide by an agency's classification of its rule. *See*, *e.g.*, *id.* at 68 ("We need not defer to the Secretary's interpretation, therefore, as the conclusions we reach tilt us strongly in the other direction.").

For the foregoing reasons, we conclude the 2015 Rule is legislative and therefore does not apply retroactively. In this case, that means the out-of-pocket

limit for plans in effect before 2016 should be governed by the terms of the

policy, not the 2015 Rule. Part IV.4 of the 2014 health insurance plan (the "2014

Policy") provides:

> When You have met Your In-Network Out-of-Pocket Limit in payment of In-Network Deductibles, Copayments, and Coinsurance for a Plan Year in the Schedule of Benefits in section XIV of this Certificate, We will provide coverage for 100% of the Allowed Amount for Covered in-network Services for the remainder of that Plan Year. If other than Individual coverage applies, when members of the same family covered under this Certificate have collectively met the family In-Network Out-of-Pocket Limit in payment of In-Network Deductibles, Copayments and Coinsurance for a Plan Year in the Schedule of Benefits, We will provide coverage for 100% of the Allowed Amount for the rest of that Plan Year.[7]

No. 20-3148, App'x at 305. A straightforward reading of the 2014 Policy indicates

that the family out-of-pocket limit applies to an individual on a family plan.[8] The

third sentence of Section IV.4 of the 2014 Policy provides specifically that "[i]f

other than individual coverage"—that is, family coverage—"applies," the out-of-

pocket limit is met when the family limit is "collectively" satisfied by the family's

medical expenses. There is no dispute that Fisher, the spouse of a D&S partner,

---

[7] Similar language is present in the 2015 health insurance plan ("2015 Policy"), so our analysis applies to both plans. No. 20-3804, App'x at 47.

[8] Fisher does not contest this reading of the 2014 Policy or 2015 Policy on appeal.

was covered as a family member by the 2014 Policy. Therefore, the family out-of-pocket limit applies to Fisher's reimbursement requests. *See Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) ("When an agreement is unambiguous on its face, it must be enforced according to the plain meaning of its terms.").

Fisher's arguments regarding the out-of-pocket limit are unpersuasive. First, Fisher argues that it was error for the district court (Sullivan, *J.*) to consider whether the 2015 Rule should apply retroactively because Fisher asserts rights under the ACA, not any administrative action. Putting aside the fact that Fisher raised the 2015 Rule below in the first instance, it is clearly not error for a federal court to consider the agency interpretation of a statute it administers in order to determine how to apply the statute. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer.").

Second, Fisher argues that the text, structure, and legislative history of the ACA demonstrate that the individual out-of-pocket limit applies to individuals enrolled in a family plan. On the text, she argues that Section 18022(c)(1)(A),

41

which states that "[t]he cost-sharing incurred under a health plan with respect to self-only coverage or coverage other than self-only coverage for a plan year beginning in 2014 shall not exceed the dollar amounts in effect under section 223(c)(2)(A)(ii) of title 26 for self-only and family coverage, respectively, for taxable years beginning in 2014," implies that Congress intended that the out-of-pocket limit for an individual should not exceed either of the amounts set forth in 26 U.S.C. § 223(c). Section 223(c) sets forth the out-of-pocket limits for individuals on self-only coverage ($5,000) and family coverage (twice the self-only coverage amount).[9] Fisher places too much emphasis on the use of "amounts" rather than "amount" in Section 18022(c). An equally, if not more likely, interpretation would be that the word "respectively" indicates that the plural "amounts" refers to the thresholds established for individuals on self-only plans versus family plans, meaning that the out-of-pocket limit for those on self-only coverage should not exceed the limit for individuals on self-only coverage in Section 223(c) and that individuals on family plans should not exceed the

---

[9] These amounts are indexed to the rate of medical inflation. *See* 42 U.S.C. § 18022(c)(4).

limits for family coverage in Section 223(c). In any event, the ACA is ambiguous on this point as discussed above. *See* Majority Op. at 33.

On the structure and purpose of the ACA, Fisher argues that the ACA extends greater insurance benefits to families so Section 18022(c) must do the same. But Section 18022(c) already provides greater insurance benefits to families by placing a statutory cap on family out-of-pocket limits. 42 U.S.C. § 18022(c)(1)(A) ("The cost-sharing incurred under a health plan with respect to self-only coverage or coverage other than self-only coverage for a plan year beginning in 2014 shall not exceed the dollar amounts in effect . . . ."). This section fulfills the ACA's purpose of extending greater insurance benefits to families without clearly indicating that the individual out-of-pocket limit should apply to an individual on a family plan.

For the foregoing reasons, we affirm the district court's holding that the ACA does not provide that the annual limitation on cost sharing for self-only coverage applies to all individuals regardless of whether the individual is covered under a self-only plan or is covered by an individual or family plan for plans in effect prior to 2016.

V.     **Cost Differential Under the Affordable Care Act**

Fisher also argued that the Choose Generic cost differential ("Cost Differential") should count toward her out-of-pocket limit in her claims regarding the 2014 and 2015 plans.[10] In *Fisher I*, the court (Woods, *J.*) held that Aetna's decision that the Cost Differential did not count toward Fisher's out-of-pocket limit was not arbitrary and capricious. *Fisher I*, 2020 WL 2792994, at *13. Fisher then argued in her motion for summary judgment that the ACA requires cost-sharing provisions, such as the Cost Differential, to count toward her out-of-pocket limit. The district court (Woods, *J.*) again rejected this argument in *Fisher II*, holding that Fisher's EffexorXR was "not a covered service." *Fisher II*, 478 F. Supp. 3d at 499.

On appeal, Fisher argues that under the ACA, the Cost Differential must count toward her out-of-pocket-limit. She argues the Cost Differential is "cost-sharing" under the terms of the Act and that EffexorXR was a covered service.

Aetna responds that the Cost Differential was not a "covered service" under the health insurance plans, and, besides, Fisher did not exhaust her out-of-

---

[10] In *Fisher III*, the district court (Sullivan, *J.*) did not reach this issue because it found that Fisher did not meet her out-of-pocket limit. *Fisher III*, 2019 U.S. Dist. LEXIS 233798, at *20.

pocket limit for 2014. As for the 2015 plan, Aetna argues that Fisher waived this argument because she never presented this argument to Aetna in her 2015 administrative appeal.

The Choose Generic clause of the 2014 Policy and 2015 Policy states: "An additional charge may apply when a Prescription Drug on a higher tier is dispensed at Your or Your Provider's request, when a chemically equivalent Prescription Drug is available on a lower tier unless We approve coverage at the higher tier. You will have to pay the difference between the cost of the Prescription Drug on the higher tier and the cost of the Prescription Drug on the lower tier." No. 21-1, App'x at 116 (emphasis added).[11]

The ACA states:

> **(3) Cost-sharing**. In this title—
> **(A) In general**
> The term 'cost-sharing' includes—
> > (i) deductibles, coinsurance, copayments, or similar charges; and
> > (ii) any other expenditure required of an insured individual which is a qualified medical expense (within the meaning of section 223(d)(2) of Title 26) with respect to essential health benefits covered under the plan.
> **(B) Exceptions**
> Such term does not include premiums, balance billing amounts for non-network providers, or spending for non-covered services.

---

[11] The 2015 health insurance plan has an equivalent Choose Generic clause.

42 U.S.C. § 18022(c)(3).

The issue is whether the Cost Differential falls under the exception to Section § 18022(c)(3)(B) "as spending for non-covered services." We hold that under the terms of the 2014 and 2015 Policy and the ACA, the Cost Differential does not count toward Fisher's out-of-pocket limit.

To qualify as a "Covered Service[]" under the 2014 or 2015 Policy, the service must be "medically necessary." No. 20-3804, App'x at 41. A service is "medically necessary" if, among other things, (1) it is "not primarily for the convenience of You, Your family, or Your Provider," and (2) it is "not more costly than an alternative service or sequence of services, that is at least as likely to produce equivalent therapeutic or diagnostic results." No. 20-3804, App'x at 46.

Aetna directly communicated to Dunnegan that Fisher could seek a medical-necessity waiver of the Choose Generic provision which would allow Aetna to cover the EffexorXR and only charge Fisher for the copay. No. 20-3148, App'x at 394-95, 414. However, Fisher "never sought a medical-necessity waiver." *Fisher I*, 2020 WL 2792994, at *13. Dunnegan faxed Dr. Rosenfeld on August 19, 2014, requesting he call Aetna and discuss whether they could pay for

46

EffexorXR. But on August 21, Dunnegan changed his mind and directed Dr. Rosenfeld not to request a waiver. As the district court (Woods, *J.*) concluded, "[t]hat decision is explicable only by reference to Dunnegan's interest in converting an administrative hassle into a potentially lucrative class-action lawsuit, with his [w]ife as lead plaintiff and his firm as plaintiff's counsel." *Fisher I*, 2020 WL 2792994, at *13.

Here, Fisher repeats the same argument she made below that her EffexorXR prescription was a covered service because Dr. Rosenfeld, in a sworn statement, stated that EffexorXR was medically necessary for Fisher. However, Dr. Rosenfeld "did not certify EffexorXR was medically necessary in the relevant sense; that is, he did not certify that EffexorXR was medically necessary relative to the venlafaxine." *Fisher I*, 2020 WL 2792994, at *12. Because Fisher failed to apply for and obtain a medical-necessity waiver, EffexorXR could not be considered medically necessary and therefore, could not qualify as a "covered service" under the policy. Accordingly, the Cost Differential falls under the exceptions to cost-sharing in Section 18022(c)(3)(B) and does not count toward Fisher's out-of-pocket limit.

Fisher makes the same argument in her appeal regarding her 2015 Policy. In *Fisher III*, the district court (Sullivan, *J.*) held that Fisher did not exhaust her out-of-pocket limit for 2015 so it did not reach the issue. *Fisher III*, 2019 U.S. Dist. LEXIS 233798, at *20 ("Since there is no dispute that [Fisher's] expenditures did not exceed the out-of-pocket limit for her family plan in 2015, the Court need not decide whether Aetna approved EffexorXR as medically necessary in 2015."). Fisher does not dispute this on appeal. Therefore, we need not determine whether Aetna approved EffexorXR as medically necessary in 2015 and the district court's (Sullivan, *J.*) judgment in favor of Aetna on this issue is affirmed.

**CONCLUSION**

For the foregoing reasons, we affirm the various judgments of the two district courts.